T.C. Memo. 1997-136

UNITED STATES TAX COURT

PAN AMERICAN FOODS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4875-94.                    Filed March 17, 1997.

<u>David O. Stevens</u>, for petitioner.

<u>Sheri Wilcox</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes for 1988, 1989, 1990, and 1991,
as follows:

| Taxable Year Ending | Deficiency |
|---|---|
| June 30, 1988 | $576,964 |
| June 30, 1989 | 632,046 |
| June 30, 1990 | 511,793 |
| June 30, 1991 | 81,389 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement, the issue for decision is whether certain funds transferred to entities related to petitioner constitute ordinary and necessary business expenses under section 162(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. When the petition was filed, petitioner's principal place of business was located in Houston, Texas.

During the years in issue, petitioner operated as the exclusive U.S. corporate distributor for Gamesa, S.A. de C.V. (Gamesa), a Mexican manufacturer of food products, such as cookies, crackers, bakery goods, and pasta.

In 1984, a Mexican businessman named Alberto Santos de Hoyos (Santos de Hoyos) formed petitioner as a Texas corporation and as a wholly owned subsidiary of Cremin Corp., B.V. (Cremin), a newly formed Netherlands corporation. Cremin in turn was a wholly owned subsidiary of Rubbik Corp., N.V. (Rubbik), a newly formed Netherlands Antilles corporation.

Santos de Hoyos indirectly owned 100 percent of Rubbik through two wholly owned trusts, and he also indirectly owned 9.5 percent of Gamesa through his partial ownership interest in Gamesa's majority shareholder.

As indicated, petitioner was formed in 1984 to operate as the direct U.S. distributor of Gamesa's food products. By establishing petitioner as its direct U.S. distributor, Gamesa's management hoped to capitalize on a growing and profitable market for Gamesa's food products in the United States and to reduce the unauthorized importation of Gamesa's food products into the United States.

Prior to 1984, importers had been purchasing Gamesa's food products in Mexico, illegally importing the products into the United States, and selling Gamesa's products to supermarkets and distributors that served U.S. markets. Products distributed in the United States in this manner were often outdated or damaged by the time they reached U.S. markets, sold at discount prices, and damaged Gamesa's reputation.

The U.S. Customs Service (U.S. Customs) will seize "gray market" imports (i.e., foreign-manufactured products that are imported into the United States without authorization of the U.S. corporation holding U.S. trademarks on the products).

By agreement dated June 12, 1984, Gamesa assigned its U.S. trademark for "Gamesa" to petitioner to qualify petitioner for gray market protection with regard to Gamesa's products that were

illegally imported into the United States.  Effective October 17, 1984, petitioner registered the "Gamesa" trademark with U.S. Customs.  No payment was due from petitioner to Gamesa with regard to the "Gamesa" trademark.

In November of 1984, petitioner applied for and was eventually granted gray market protection by U.S. Customs with regard to Gamesa's products.  In its application for gray market protection, petitioner represented to U.S. Customs that petitioner and Gamesa were not under common ownership or control.

In distributing products to U.S. markets, in order to meet requirements of the U.S. Food and Drug Administration and preferences of purchasers in the United States, Gamesa made certain modifications to the ingredients, design, packaging, marketing, and advertising of many of its products.  Pursuant to distribution contracts that were entered into between Gamesa and petitioner, petitioner agreed to supply Gamesa with information that would aid Gamesa in such modifications of its products for U.S. markets.  Petitioner did not, however, agree to pay Gamesa a fee for such modifications.

The packaging of Gamesa's products, including those purchased and distributed in the United States by petitioner, carried the "Gamesa" trademark and the letter "g" trademark.  The "Gamesa" and "g" trademarks were added to the packaging of Gamesa's products by Gamesa.  Petitioner used both trademarks in advertising Gamesa's products in the United States.

According to records maintained for the years in issue by U.S. Customs and by the U.S. Patent and Trademark Office, Gamesa, not petitioner, was the registered owner of the "g" trademark in the United States.

During the years in issue, purportedly pursuant to a licensing agreement between petitioner and Cremin with respect to the "g" trademark, petitioner transferred funds to Cremin as follows:

| Taxable Year | Funds Transferred to Cremin |
|---|---|
| 1988 | $ 589,462 |
| 1989 | 761,506 |
| 1990 | 681,601 |
| 1991 | 261,057 |
| Total | $2,293,626 |

The funds transferred by petitioner to Cremin were periodically deposited into Cremin's bank account with Citibank International (Citibank) in Houston, Texas, by Rodolfo de la Garza (de la Garza), Cremin's only employee. De la Garza also periodically served on petitioner's and on Gamesa's boards of directors.

Most funds withdrawn from Cremin's bank account during the years in issue were transferred to Rubbik. Gamesa apparently did not receive any of the above funds that petitioner transferred to Cremin.

During the years in issue, petitioner also transferred funds to Rubbik as follows:

| Taxable Year | Funds Transferred to Rubbik |
|---|---|
| 1988 | $1,135,745 |
| 1989 | 1,061,050 |
| 1990 | 763,790 |
| 1991 | 87,050 |
| Total | $3,047,635 |

Petitioner transferred the above funds to Rubbik pursuant to five written "consulting" agreements between petitioner and Rubbik under which Rubbik agreed to provide consulting services to petitioner relating to the modifications to be made to Gamesa's products to make them suitable for sale in the United States. These agreements were signed by officers of petitioner at the direction of de la Garza, and the agreements were not negotiated at arm's length.

The services mentioned in the above consulting agreements were to be performed primarily by Gamesa employees in Mexico, not by employees of Rubbik.

The funds transferred by petitioner to Rubbik were deposited by de la Garza into Rubbik's bank account with Citibank in Houston, Texas. For the years in issue, de la Garza was Rubbik's only employee, and he held sole signature authority over Rubbik's bank account.

Most funds withdrawn from Rubbik's bank account during the years in issue were transferred to Koala Corp., Ltd. (Koala Corp), a trust that was indirectly wholly owned by Santos de

Hoyos. Gamesa apparently never received any of the funds that were transferred by petitioner to Rubbik under the above consulting agreements.

During the years in issue, Gamesa did not charge distributors who distributed Gamesa's products in Mexico for services relating to product development, design, packaging, or marketing of the products. Further, Mexican distributors of Gamesa's products apparently did not make payments to Gamesa relating to the "Gamesa" or "g" trademarks.

Effective October 1, 1990, PepsiCo, Inc. (PepsiCo) acquired a controlling interest in Gamesa, but petitioner continued as the sole authorized distributor of Gamesa's products in the United States. Until August of 1991, petitioner continued to distribute Gamesa's products in the United States bearing the "g" trademark, and petitioner continued to use the "g" trademark in the United States to advertise Gamesa's products.

After PepsiCo acquired Gamesa, petitioner no longer transferred funds to Cremin and Rubbik.

On August 6, 1991, at PepsiCo's insistence, Gamesa terminated its distribution agreement with petitioner. At the same time, petitioner, Cremin, and Rubbik agreed to transfer back to Gamesa or otherwise cancel any and all rights they possessed to the "g" trademark. PepsiCo required this cancellation of rights to the "g" trademark because PepsiCo could not determine

exactly which company or companies owned rights to the "g" trademark.

On its Federal income tax returns for the years in issue, petitioner claimed business expense deductions for the total $2,293,626 in funds transferred to Cremin and for the total $3,047,635 in funds transferred to Rubbik.

On audit, respondent disallowed petitioner's claimed deductions for the funds transferred to Cremin and Rubbik on grounds that the deductions did not constitute ordinary and necessary business expenses under section 162(a).

## OPINION

A taxpayer may deduct all ordinary and necessary expenses incurred in carrying on a trade or business. Sec. 162(a). Ordinary expenses are described as those expenses that are normal, common, and accepted within a taxpayer's trade or business, and necessary expenses are described as those that are helpful and appropriate to a taxpayer's trade or business. Tulia Feedlot, Inc. v. United States, 513 F.2d 800, 804 (5th Cir. 1975); Boser v. Commissioner, 77 T.C. 1124, 1132 (1981). Transactions between a taxpayer and related parties are subject to special scrutiny. Tulia Feedlot, Inc. v. United States, supra at 805. Generally, a taxpayer has the burden of proof and must prove the deductibility of claimed deductions. Rule 142(a).

Petitioner argues that the funds transferred to Cremin and

Rubbik represented part of the total wholesale price charged by Gamesa to petitioner for Gamesa's products, that the funds could have been paid directly to Gamesa as part of the price of the products, and that the funds were transferred instead to Cremin and Rubbik to bolster the appearance that Gamesa and petitioner were not controlled by the same owners so that petitioner would qualify for gray market protection with regard to Gamesa's products distributed in the United States.

With regard specifically to the $2,293,626 in funds transferred to Cremin, petitioner argues that it received rights to the "g" trademark through Cremin and Rubbik and that Rubbik had received its rights to the "g" trademark from Gamesa, that the funds transferred to Cremin constituted royalties paid pursuant to the alleged licensing agreement between petitioner and Cremin, and that the funds transferred to Cremin, therefore, constituted ordinary and necessary business expenses.

With regard specifically to the $3,047,635 in funds transferred to Rubbik, petitioner argues that Rubbik, through de la Garza, served as a broker of the services performed by Gamesa to customize its products for U.S. markets and that the funds transferred to Rubbik, therefore, constituted ordinary and necessary business expenses.

Respondent argues that petitioner was not obligated to pay Cremin royalties because Cremin never owned any rights to the "g" trademark, that neither Rubbik nor de la Garza acted as a broker

of the services performed by Gamesa to customize Gamesa's products for U.S. markets, that product manufacturers do not customarily charge distributors directly for services similar to those performed by Gamesa, and therefore, that the funds petitioner transferred to Cremin and Rubbik did not constitute ordinary and necessary business expenses.

We agree with respondent. The ordinary and necessary nature of the funds transferred by petitioner to Cremin and Rubbik and petitioner's arguments in support thereof are not supported by the evidence.

Petitioner's argument assumes that Gamesa somehow received the benefit of the funds that petitioner transferred to Cremin and Rubbik. The facts indicate, however, that Gamesa did not receive any such benefit. Nor does the record indicate that the funds transferred to Cremin and Rubbik facilitated in any way petitioner's qualification for gray market protection for Gamesa's products.

With regard to the $2,293,626 in funds transferred to Cremin, the facts do not indicate that Cremin owned any rights to the "g" trademark when it entered into the alleged licensing agreement with petitioner. Petitioner's expert's opinion regarding the ownership of the "g" trademark was generally unpersuasive, not supported by the evidence, and not credible.

Also, for the years in issue, Gamesa (not petitioner, not Cremin, and not Rubbik) was the registered U.S. owner of the "g"

trademark. No other entity recorded or registered any rights to the "g" trademark. After terminating its payments to Cremin upon PepsiCo's acquisition of an interest in Gamesa, petitioner continued to distribute Gamesa's products, and petitioner continued to use the "g" trademark for advertising purposes. These facts refute the claimed relationship between the funds transferred by petitioner to Cremin and petitioner's use of the "g" trademark.

We note that PepsiCo, after acquiring an interest in Gamesa, could not even determine which companies owned the rights to the "g" trademark. PepsiCo simply required that all of the related companies transfer back to Gamesa or otherwise cancel any and all rights they may have owned to the "g" trademark.

Petitioner also has not established that it is customary for a distributor to make payments similar to those involved in this case relating to a manufacturer's products. We note that Mexican distributors of Gamesa's products did not make any similar payments.

With regard to the $3,047,635 in funds transferred to Rubbik during the years in issue, if in fact the funds represented payment for services performed by Gamesa, petitioner has not adequately explained why the funds were transferred to Rubbik, and not to Gamesa. Petitioner's claim that de la Garza served as a broker of the services performed by Gamesa is not supported by the evidence.

The funds transferred by petitioner to Rubbik were deposited into Rubbik's bank account and then transferred to Koala Corp. The evidence does not indicate that Gamesa received any funds from Rubbik, from petitioner, or from Koala Corp., for services that it performed to customize its products for U.S. markets.

The services provided by Gamesa, such as product design and packaging, are the type of services that manufacturers customarily perform on their own behalf and for which separate charges are not made to distributors.  Also, the distribution agreements between Gamesa and petitioner did not provide that petitioner would make payments to Gamesa for services relating to product modifications.

The evidence does not establish that the funds transferred by petitioner to Cremin and Rubbik constituted ordinary and necessary business expenses under section 162(a).

We have considered the parties' other arguments and find them without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.